# United States Court of Appeals
## For the First Circuit

No. 07-1587

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM OLIVERO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Daniel Klubock with whom Feinberg & Kamholtz was on brief for
appellant.
Jennifer Hay Zacks, Assistant United States Attorney, with
whom Michael J. Sullivan, United States Attorney, was on brief for
appellee.

January 9, 2009

**LYNCH, Chief Judge.** William Olivero, convicted by a jury of an interstate cocaine trafficking conspiracy, appeals from the sentence imposed after this court vacated his original sentence and remanded for re-sentencing on the government's appeal. United States v. Yeje-Cabrera, 430 F.3d 1 (1st Cir. 2005). In the original sentencing, Olivero received 48 months' imprisonment and five years of supervised release. On remand, Olivero's case was reassigned to another judge and this judge re-sentenced him to 235 months' imprisonment and five years of supervised release.

Olivero challenges his new sentence on three grounds of claimed error: (1) that the court could not rely on the presentence report ("PSR") alone to find him responsible for a December 8, 2001 shipment of 260 kilograms of cocaine when the jury had made no specific drug quantity finding; (2) that the court erred in denying him minor role and acceptance of responsibility downward adjustments; and (3) that the court failed to recognize its discretionary power to depart from the Guidelines sentence. Olivero's appeal primarily raises issues about what re-sentencing requires of a sentencing judge who was not the original trial judge. We reject Olivero's argument that the re-sentencing court could not rely on inferences from the uncontroverted facts in the PSR and affirm.

The saga of this major drug conspiracy is told in our prior opinion, Yeje-Cabrera, 430 F.3d at 5-7. We mention briefly the reasons for the re-sentencing to put in context the arguments concerning the new sentence. The original sentence of only 48 months of imprisonment for a defendant in a large drug conspiracy was lenient and was based on a series of errors. The court erroneously limited the drug amount to less than 500 grams of cocaine when, as we said, it "could (and should) have found Olivero responsible for the amount of cocaine established by a preponderance of the evidence against him." Id. at 23. The original sentencing court never did that calculation and that alone meant the sentence had to be vacated and remanded. But more than that, the district court sua sponte gave Olivero a low sentence in order to punish the government for what the court thought was impermissible fact bargaining and withholding of information from the court. We found no basis in fact or law for any of these rationales. Id. at 23-30. To be explicit, Olivero's original sentence simply cannot be used as a benchmark against which to assess his re-sentencing to a longer term of imprisonment.

A.      Olivero's Arrest and Conviction

We repeat here a few of the facts most pertinent to the re-sentencing. Olivero's cousin Rafael Yeje-Cabrera headed a criminal cocaine distribution ring transporting massive quantities

of cocaine from Arizona to New York, Rhode Island, and Massachusetts. The multi-jurisdictional DEA investigation of the ring was named "Operation Vise-Grip." See id. at 5-7. Olivero, who used the aliases "Alejandro" and "K" and lived in New York City, assisted with shipments, distributed the cocaine, and collected the money. Id. at 5. This was a family based drug business: Yeje-Cabrera's mother and his uncles were active participants, along with Olivero, who was Yeje-Cabrera's cousin. The seizure of two large tractor-trailers of drugs bookended the case. One tractor-trailer was seized in New York in April of 2001, and the police found inside over 300 kilograms of cocaine, over $400,000 in cash, and a cell phone with numbers for both Yeje-Cabrera and Olivero. Id.

Law enforcement agents put wiretaps on Yeje-Cabrera's telephone lines after they seized the 300-kilogram shipment of cocaine. Id. at 5-6. Agents recorded conversations between Yeje-Cabrera and Olivero about the business on October 28, 2001, November 2, 2001, November 5, 2001, and December 2, 2001. Details of the transcripts are described later.

DEA agents learned that a large shipment was scheduled to arrive near New Bedford, Massachusetts. On October 28, 2001, Yeje-Cabrera prepared for a shipment of cocaine for "Tony" by enlisting Olivero to find a place to store a truck. On December 8, 2001, agents seized a tractor-trailer loaded with 260 kilograms of

cocaine after its driver backed into a state trooper's cruiser. Id. at 6. At the time, this was the largest drug seizure in Massachusetts history. Undaunted by the seizure, the conspiracy continued, and Yeje-Cabrera and Olivero had further conversations on December 10 arranging a drug deal. Agents later arrested Olivero, Yeje-Cabrera, and several others.

Olivero was tried with Yeje-Cabrera and two other co-conspirators. He earlier had agreed to plead guilty but then withdrew his plea. The trial court gave the jury a special verdict form, which asked the jury to find the quantity of drugs for which each defendant found guilty was responsible. See id. at 12 & n.4. The jury found all four defendants guilty. It found Yeje-Cabrera responsible for 260 kilograms of cocaine and another defendant responsible for five kilograms. The jury left the quantity field on Olivero's special verdict form blank. See id. at 12. Yeje-Cabrera was sentenced to life imprisonment and fined sixteen million dollars.

B.      Olivero's Re-sentencing

On remand, Olivero's re-sentencing was assigned to a different district judge, in accordance with the court's local rules. The court reviewed the PSR, which included transcripts of conversations intercepted on the wiretaps (described below), our opinion in Yeje-Cabrera, and the parties' sentencing memoranda. It conducted a sentencing hearing over two days, granting a

continuance to a second day at the request of defense counsel. Olivero's basic theme was that he was just an "errand boy" doing favors for his cousin for little money and had no idea of the depth and breadth of his cousin's drug trafficking. The PSR had used the term "errand boy." The prosecution pointed out that two witnesses said Olivero ran the New York operation for Yeje-Cabrera. The court concluded that Olivero played an important part in facilitating the 260-kilogram shipment and that he was responsible for at least that amount of cocaine. The court concluded that Olivero did not qualify for a downward adjustment as a minor or minimal participant based on his role in the 260-kilogram shipment. It also declined to make an adjustment based on acceptance of responsibility because Olivero chose to go to trial.

The court calculated Olivero's base offense level at 38, based on his responsibility for 150 or more kilograms of cocaine, and assigned him a criminal history category of I. The resulting Guidelines range was 235 to 240 months, the statutory maximum. The prosecution suggested 235 months as an appropriate sentence. The court declined to depart from the Guidelines and sentenced Olivero to 235 months, the lowest end of the range. Olivero appealed.

II.

We review Olivero's challenges to the court's drug quantity determination and its denial of role in the offense and acceptance of responsibility downward adjustments, all factual

-6-

determinations, for clear error.  <u>United States</u> v. <u>Morales-Madera</u>, 352 F.3d 1, 14 (1st Cir. 2003); <u>United States</u> v. <u>Cash</u>, 266 F.3d 42, 45 (1st Cir. 2001); <u>United States</u> v. <u>Santos Batista</u>, 239 F.3d 16, 21 (1st Cir. 2001).

A.        <u>Drug Quantity Determination</u>

Olivero's primary argument on appeal raises the question of whether a re-sentencing judge must go back and reread the transcripts of relevant testimony as well as the PSR in order to make key Guidelines findings, such as the drug quantity amount.  He argues that since the re-sentencing court admittedly did not do that, it could not rely on the PSR and this court's opinion alone. The argument continues that even if the information in the PSR alone could be relied on, the text of the wiretaps set forth in the PSR did not provide a sufficient basis to make the finding of a relevant drug quantity of 260 kilograms of cocaine.  This was not the focus of the argument before the district court, however. Nonetheless, we address the argument on its merits.

As to the first argument, there are no hard and fast doctrines about what a sentencing or re-sentencing judge who was not the trial judge must consult other than the normal documents required by the Federal Rules of Criminal Procedure.  <u>See</u> Fed. R. Crim. P. 32(c)(1)(A) (noting that a PSR must be prepared for each defendant but that a sentencing court may rely on the record alone); <u>id.</u> § 32(d) (specifying contents of PSR); <u>id.</u>

§ 32(i)(1)(B), (i)(2) (a court must give parties a summary of information excluded from PSR on which court will rely and may take evidence); id. § 32(i)(1)(C) (a court must hear parties' comments on the PSR and other matters relating to sentencing); id. § 32(i)(4) (a court must let defendants and victims speak); see also U.S.S.G. § 6A1.3(a) (the information on which a sentencing court resolves a factual dispute must have sufficient indicia of reliability to support its probable accuracy). The ultimate test is whether the defendant can show clear error in the factual findings made by the court from whatever sources were consulted. In some situations, at least in theory, the argument that the sources were insufficient could be made out if there was an inadequate basis for the findings.

The district court here reviewed the evidence contained in the PSR, the facts discussed in Yeje-Cabrera, and the parties' sentencing memoranda. It also heard argument from both parties. Here, the trial lasted twenty days. Had the re-sentencing judge found the information in the PSR, the Yeje-Cabrera opinion, and the parties' sentencing memoranda inadequate, the judge may well have chosen to go back to review the testimony.

The information in the PSR and our prior opinion did, however, provide a sufficient basis for the finding that Olivero

was responsible for at least 260 kilograms of cocaine.[1] In particular, the PSR contained wiretap transcripts of two conversations. There is no dispute about the fact or content of these conversations. On December 2, 2001, six days before the 260-kilogram shipment of cocaine was seized in Massachusetts, Yeje-Cabrera and Olivero (who also used the names "K" or "Alejandro") spoke:

> Yeje-Cabrera: Yo, K.
> Olivero: Yeah!
> Yeje-Cabrera: . . . Listen man, you have to get in contact with Nino [one of Yeje-Cabrera's New York customers] somehow. That "stuff" is around and I can't get in contact with him. . . . Yo, you've got to go and get in contact with Nino ASAP. Right away, K.
> Olivero: All right.
> . . .
> Yeje-Cabrera: Yo, K, go look for him because there are 300 pesos coming in. Man, they need to give me . . . , I need my money. I can't even pay my insurance.
> Olivero: All right.

In a December 5 conversation, Yeje-Cabrera and his customer Nino discussed the price of the cocaine:

> Yeje-Cabrera: I don't care if I don't make a lot, I just want to get rid of that. . . . What number is it over there?
> Nino: No, you have to talk to your uncle to find out because [it] is lower.

---

[1] There was evidence that Olivero played an important role in other parts of the conspiracy. For example, the PSR contained transcripts of conversations in which Olivero agreed to "babysit" a drug supplier. Olivero's role in the 260-kilogram shipment alone was sufficient to meet the statutory and Guidelines thresholds for his sentence. See 21 U.S.C. § 841(b); U.S.S.G. § 2D1.1(a)(3) & (c)(1).

> Yeje-Cabrera: No, my uncle told me.  It was
> K's, Alejandro's.
> Nino: No, tell him to find out over here in
> Manhattan.  Have him check it out.

The court found these conversations established that Yeje-Cabrera called Olivero and specifically advised him of the size of the load (260 kilograms of cocaine) and then asked him to facilitate the connection with Nino.  It said the tapes showed "there was some significant reliance placed on [Olivero] in facilitating transactions."

Olivero argues on appeal that, because the district court "did not hear or see witnesses," it could not evaluate the controverted evidence in the PSR, and thus had to rely on the PSR's interpretation of the evidence.  But there is no disputed evidence, only competing interpretations of what the conversations meant.  Rule 32(i)(3)(A) is explicit that the court may accept any undisputed portion of the PSR as a finding of fact.[2]  If the facts plausibly support competing inferences, as here, a sentencing court cannot clearly err in choosing one.  United States v. Prochner, 417 F.3d 54, 66 n.9 (1st Cir. 2005).

---

[2]     Olivero cites the language from an Eighth Circuit opinion that "[a] PSR is not evidence." United States v. Jenner, 473 F.3d 894, 897 (8th Cir. 2007).  Jenner is easily distinguishable. There, the facts were disputed and the district court made no factual findings as required by Rule 32(i) and relied only on the prosecution's allegations.  Cf. United States v. Grant, 114 F.3d 323, 327-28 (1st Cir. 1997).

Our law is clear on what reliance a district court may place on a PSR. A good general summation is found in United States v. Cyr, 337 F.3d 96, 100 (1st Cir. 2003):

> "Generally, a PSR bears sufficient indicia of reliability to permit the district court to rely on it at sentencing." United States v. Taylor, 277 F.3d 721, 724 (5th Cir. 2001). The defendant is free to challenge any assertions in the PSR with countervailing evidence or proffers, in which case the district court is obliged to resolve any genuine and material dispute on the merits. But if the defendant's objections to the PSR are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on the facts in the PSR.

In a restitution case, we have upheld reliance on a PSR's listing of victims and loss amounts "[i]n the absence of rebuttal evidence beyond defendant's self-serving words." Prochner, 417 F.3d at 66.

The court did not clearly err in concluding that the transcripts showed Olivero played a significant role in the entire transaction.[3]

B.        Role in the Offense Determination

Olivero next argues the court erred in refusing to enter an adjustment for playing a minor role in the offense. The court found that it was sufficient to reject the adjustment that Olivero

---

[3]    Olivero also argues that the jury's answer to the special verdict question mandates that he be found responsible "only for the minimum amount of cocaine." This argument is inconsistent with our holding in Yeje-Cabrera that the verdict left the drug quantity determination to the court. Yeje-Cabrera, 430 F.3d at 23.

was directly and actively involved in at least the 260-kilogram transaction.

The government argues that review should be for plain error because Olivero sought a four-level minimal, rather than a two-level minor, role adjustment before the district court but he argues only for a minor role adjustment on appeal. Compare U.S.S.G. § 3B1.2(a) (allowing a four-level reduction for a minimal role), with id. § 3B1.2(b) (two-level reduction for a minor role). The two subsections involve separate inquiries. See id. § 3B1.2 cmt. nn. 4 & 5. To avoid confusion, it would be better if the terms were not used interchangeably, as they were by defendant's counsel before the re-sentencing court. But we think the prosecution pushes its waiver argument too far. Judges faced with a request for a four-level reduction for a minimal role could reasonably consider, in the course of that analysis, whether a lesser two-level reduction for a minor role had been made out. Since here the court stated it was considering the issue of "minor or minimal participation," we treat Olivero's argument as properly before us.

Olivero argues that the wiretap transcripts show only that he was a "gofer," who did "errands" and "very low level tasks" and received very little income. He also cites cases upholding grants of minor role adjustments to defendants who, in his view, played a greater role in their offenses. See, e.g., United States

-12-

v. <u>Whiting</u>, 522 F.3d 845 (8th Cir. 2008); <u>United States</u> v. <u>Vicari</u>, No. 06-1302, 2007 WL 2031299 (6th Cir. July 11, 2007).

The district court did not clearly err. The record shows Olivero played an active role, which included negotiating with customers and addressing logistical issues. A role adjustment determination is "heavily driven by the facts," and "absent a mistake of law, battles over a defendant's status . . . will almost always be won or lost in the district court." <u>United States</u> v. <u>Sanchez</u>, 354 F.3d 70, 74 (1st Cir. 2004) (omission in original) (quoting <u>United States</u> v. <u>Graciani</u>, 61 F.3d 70, 75 (1st Cir. 1995)).

Olivero also claims the court erred in basing its role determination on his <u>knowledge</u> of the 260-kilogram shipment because knowledge of the scope of an offense is relevant only to a minimal role adjustment. However, the court based its conclusion on Olivero's role in facilitating the 260-kilogram shipment rather than on his mere knowledge of it.

C.        Acceptance of Responsibility

Olivero also challenges the court's refusal to enter a downward adjustment for acceptance of responsibility.[4]   See U.S.S.G. § 3E1.1(a).

Olivero says he was entitled to an adjustment because he initially agreed to a plea bargain but then withdrew his agreement. See Yeje-Cabrera, 430 F.3d at 21.

The re-sentencing court stated:

> The application note [to section 3E1.1(a)] does of course correctly, we understand, say that it's not an automatic bright line, per se, rule that if you go to trial you can never get it; but it does then illustrate one person might go to trial and still get it.  And they're inapplicable examples.  The examples are . . . cases that in the language of the application note do not relate to factual guilt.

The court concluded that Olivero's trial was about factual guilt and that he had not "clearly" accepted responsibility under those circumstances.

Olivero argues the court adopted a per se rule that a defendant who goes to trial cannot qualify for an acceptance of

---

[4]    The government argues that the law of the case doctrine bars Olivero's challenge because he failed to appeal the court's refusal to grant such an adjustment at his first sentencing. See United States v. Ticchiarelli, 171 F.3d 24, 28 (1st Cir. 1999). The government failed to make this argument to the district court, however, and it is waived. See United States v. Paradis, 351 F.3d 21, 28 & n.6 (1st Cir. 2003); see also United States v. Bell, 988 F.2d 247, 251 (1st Cir. 1993) (noting the doctrine is not a jurisdictional limitation).  The re-sentencing court considered Olivero's argument and rejected it.

responsibility adjustment unless he or she falls under one of the examples in the application note. He argues this interpretation impermissibly burdens a defendant's constitutional right to trial.

The court did not adopt a per se rule and there was no error. A defendant's choice to put the government to its proof at trial creates a presumption that a section 3E1.1(a) adjustment is unavailable, which can be defeated only in rare situations. <u>See</u> <u>United States</u> v. <u>Deppe</u>, 509 F.3d 54, 60 (1st Cir. 2007). Olivero's trial was not similar to one of the rare exceptions, of which the application note provides examples; he instead put the government to its burden to establish factual guilt.

## III.

Finally, Olivero argues that the court erred in failing to recognize its discretionary power to depart from the Guidelines because, as its language at the sentencing hearing shows, it treated the Guidelines as mandatory. He argues that his re-sentencing should be remanded because the court failed to appreciate the impact of <u>Gall</u> v. <u>United States</u>, 128 S. Ct. 586 (2007), and <u>Kimbrough</u> v. <u>United States</u>, 128 S. Ct. 558 (2007). We review the court's sentence under a deferential abuse of discretion standard. <u>Gall</u>, 128 S. Ct. at 597; <u>United States</u> v. <u>Martin</u>, 520 F.3d 87, 92 (1st Cir. 2008).

The court clearly recognized both that the Guidelines are advisory and that the 18 U.S.C. § 3553 factors allowed it to enter a non-Guidelines sentence:

> Though the Guidelines are advisory and we're called upon to consider what a non-Guidelines sentence might be in justice, given the other factors [in § 3553], I don't think we are freed to simply act on our individual sense of justice. In sentencing . . . [judges] do things we would rather not do. We apply rules of law we would rather not apply if we were free to decide otherwise. . . .
> . . . .
> . . . I have to look for a reason, if one exists, to say why I think the Guidelines inappropriately take account of the various factors or that the other factors combine to reject the advice given by the Guidelines.

Olivero argues that the court's saying it could not act on an "individual sense of justice" and that it had to apply rules it "would rather not apply if [it] were free to decide otherwise" shows that it failed to appreciate its discretionary power to impose an individualized sentence. But as the record shows, the court correctly "treat[ed] the Guidelines as the 'starting point and the initial benchmark.'" Kimbrough, 128 S. Ct. at 574 (quoting Gall, 128 S. Ct. at 596). It then considered whether the circumstances warranted a non-Guidelines sentence. The court heard argument from the government and Olivero on this point. In fact, it granted Olivero a second sentencing hearing after defendant's counsel requested more time. The court considered Olivero's age (he was 24 years old when he was arrested) and the fact that he was

-16-

not a U.S. citizen.  It also heard from Olivero at allocution.  The court also knew of the lengthy sentences imposed on some of Olivero's co-conspirators.  It concluded there was no reason to depart from the Guidelines.  The court did not treat the Guidelines as mandatory or otherwise err; it followed the procedure for sentencing that this court has set out.  <u>See</u> <u>Martin</u>, 520 F.3d at 95.

IV.

We <u>affirm</u> Olivero's sentence.