# United States Court of Appeals
## For the First Circuit

No. 14-1033

UNITED STATES OF AMERICA,

Appellee,

v.

SIREWL COX,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Denise J. Casper, U.S. District Judge]

Before
Howard, Chief Judge,
Selya and Lipez, Circuit Judges.

Leslie Feldman-Rumpler, for appellant.
Ryan M. DiSantis, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

March 20, 2017

**LIPEZ**, **Circuit Judge**.  Between 2006 and 2008, Sirewl Cox -- a real estate developer, agent, and broker -- orchestrated a mortgage fraud scheme in Massachusetts.  After his scheme was exposed, Cox was charged with multiple counts of bank and wire fraud and money laundering.  A jury subsequently found Cox guilty on some of the charged counts, and he was sentenced to a below-guidelines term of 150 months of imprisonment.

Cox now appeals his sentence on both procedural and substantive grounds.  Specifically, he raises a flurry of objections related to the district court's use of uncharged and acquitted conduct to calculate his Guidelines Sentencing Range, and further contends that the length of his sentence was substantively unreasonable.  Cox also challenges the district court's statutory authority to order the forfeiture of assets related to uncharged relevant conduct, an issue of first impression in this circuit. For the following reasons, we affirm.

## I. Factual Background

We provide here only a brief synopsis of the essential facts of this case, reserving additional detail for the analysis that follows.[1]

---

[1] Because Cox does not contest the sufficiency of the evidence supporting his conviction, "we narrate the facts in a 'balanced way, without favoring either side.'" United States v. Arias, No. 15-1946, 2017 WL 655758, at *1 n.1 (1st Cir. Feb. 17, 2017) (quoting United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014)).

To carry out his fraudulent scheme, Cox recruited nominal or "straw" buyers to purchase multi-family "triple-decker" homes for sale. Once Cox had control of the buildings, he would perform a "triple-decker flip" -- that is, he would split the properties into condominium units and then sell those units to individual buyers, paying off the mortgages on the buildings with the proceeds. Cox promised the straw buyers a portion of the profits from the sale of condominium units.

To persuade people to purchase these units, Cox and his associates told potential buyers that they would help arrange mortgage financing for the deals. Cox also promised the buyers that they would not need to put down any of their own money for the purchase. Instead, Cox generally paid the buyers a cash "incentive fee" to purchase the condominium units. Once a buyer agreed to purchase a unit, Cox used his understanding of the mortgage industry to make the otherwise unqualified buyers appear eligible for loans. Specifically, Cox submitted false information -- such as the purchase price of the properties, borrower income, borrower assets, intent to occupy the unit, down payments, and cash paid by borrowers at closing -- to mortgage lenders.

Once these unqualified buyers received preliminary approval for loans, Cox worked with an associate, Rebecca

Konsevick[2] -- who acted as both a real estate agent on building sales to straw buyers and a closing agent on unit sales -- to close the deals. During the closing process, Cox had Konsevick submit additional false information to lenders. Cox further told Konsevick how to disperse the proceeds from the sale between himself, the straw buyers, or one of Cox's business entities.

In 2011, a federal grand jury in the District of Massachusetts returned a sixteen-count indictment charging Cox with wire and bank fraud, in violation of 18 U.S.C. §§ 1343 and 1344, and unlawful monetary transactions, in violation of 18 U.S.C. § 1957.[3] Four triple-decker flips formed the basis of the counts in the indictment: the Roxton, River, Stanwood, and 111 Fuller properties.[4]

---

[2] Konsevick pleaded guilty to counts of bank fraud (in violation of 18 U.S.C. § 1344) and unlawful monetary transactions (in violation of 18 U.S.C. § 1957). On January 24, 2013, she was sentenced to 30 months of imprisonment to be followed by two years of supervised release.

[3] Cox's half-brother, Lord Allah, was also charged in the indictment. He pleaded guilty to two counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of bank fraud, in violation of 18 U.S.C. § 1344; and two counts of unlawful monetary transactions, in violation of 18 U.S.C. § 1957. On December 19, 2012, he was sentenced to 18 months of imprisonment and two years of supervised release.

[4] We refer to the properties at issue in this appeal by the street name where each property is located, but omit the specific address, with the exception of the two Fuller properties at issue.

After a twelve-day trial, a jury found Cox guilty on eight of the sixteen counts in the indictment: Counts One through Four (wire fraud), Counts Six, Seven, and Nine (bank fraud), and Count Eleven (unlawful monetary transaction). Cox was found not guilty on seven counts: Count Five (wire fraud), Counts Eight and Ten (bank fraud), and Counts Twelve, Thirteen, Fourteen, and Sixteen (unlawful monetary transactions).

The Probation Office subsequently prepared and issued a Presentence Investigation Report ("PSR"). The PSR concluded that Cox's total offense level was 37, his Criminal History Category ("CHC") was III, and his Guidelines Sentence Range ("GSR") was 262-327 months. The PSR's calculation of Cox's total offense level and GSR was based, among other information, on both the convicted and acquitted conduct related to the four triple-decker flips identified in the indictment, as well as on uncharged conduct related to seven additional triple-decker flips.[5] Cox raised several objections to the PSR's conclusions, including the use of acquitted and uncharged conduct in the GSR calculation.

At sentencing, the district court adopted the PSR's base offense level calculation, but found that the GSR of 262-327 months was longer than necessary to satisfy the goals of sentencing as

---

[5] The uncharged conduct was based on the following seven properties: Whitfield, Vinson, Warren, Moreland, Bailey, Stellman, and 15 Fuller.

specified by 18 U.S.C. § 3553(a). The court thus imposed a below-Guidelines term of 150 months. The court also entered an order of forfeiture in the amount of $2,966,344.37. Cox now appeals both his sentence and the forfeiture amount.

## II. Standard of Review

"We review sentencing decisions imposed under the advisory Guidelines, whether outside or inside the applicable GSR, for reasonableness." United States v. Pantojas-Cruz, 800 F.3d 54, 58 (1st Cir. 2015). This review occurs in two phases. See Gall v. United States, 552 U.S. 38, 51 (2007). First, we "examine whether the district court committed any procedural missteps." United States v. Rossignol, 780 F.3d 475, 477 (1st Cir. 2015). Such missteps include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range." Gall, 552 U.S. at 51. "We have described our abuse of discretion standard in this context as 'multifaceted,' as we apply clear error review to factual findings, de novo review to interpretations and applications of the guidelines, and abuse of discretion review to judgment calls." United States v. Nieves-Mercado, 847 F.3d 37, 42 (1st Cir. 2017). Where a defendant failed to object in the district court on the

- 6 -

ground asserted on appeal, however, we review only for plain error. United States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st Cir. 2015).

In the second phase of our review, we appraise the substantive reasonableness of the sentence, "tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." United States v. Bermúdez-Meléndez, 827 F.3d 160, 163 (1st Cir. 2016)(alteration in original) (quoting Gall, 552 U.S. at 51). "In determining substantive reasonableness, substantial respect is due to the sentencing court's discretion." Bermúdez-Meléndez, 827 F.3d at 163. This deferential approach recognizes that although "[a] sentencing court is under a mandate to consider a myriad of relevant factors, . . . the weighting of those factors is largely within the court's informed discretion." United States v. Clogston, 662 F.3d 588, 593 (1st Cir. 2011). Our review demands only "a plausible sentencing rationale and a defensible result." United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008). Hence, "we limit our review to the question of whether the sentence, in light of the totality of the circumstances, resides within the expansive universe of reasonable sentences." United States v. King, 741 F.3d 305, 308 (1st Cir. 2014).

## III. Procedural Reasonableness

Cox makes a multi-pronged attack on the district court's calculation of the advisory GSR, objecting to the district court's

finding of facts by a preponderance of the evidence, as well as the imposition of three sentencing enhancements that significantly increased his GSR. We address each argument in turn.

## A. Preponderance of the Evidence Standard

Cox contends that the district court's finding of facts at sentencing by a preponderance of the evidence -- rather than under a reasonable doubt standard -- violated his Fifth Amendment right to due process and his Sixth Amendment right to trial by jury. Our law, however, is to the contrary: the preponderance-of-the-evidence baseline for considering sentencing facts has long been established in this circuit. See United States v. Lombard, 72 F.3d 170, 175-76 (1st Cir. 1995). Indeed, as Cox acknowledges, we have previously considered, and rejected, arguments that the Fifth Amendment's Due Process Clause and the Sixth Amendment right to a jury trial prohibit the finding of sentencing facts by a preponderance of the evidence. See, e.g., United States v. Munyenyezi, 781 F.3d 532, 544 (1st Cir. 2015) ("[A] judge can find facts for sentencing purposes by a preponderance of the evidence, so long as those facts do not affect either the statutory minimum or the statutory maximum." (citations omitted)); see also United States v. Watts, 519 U.S. 148, 156, (1997). In short, the district court properly applied the preponderance of the evidence standard to its fact-finding at sentencing.

**B. Sentencing Enhancements**

Cox's procedural objections are based on the district court's application of three Guidelines sentencing enhancements under U.S.S.G. § 2B1.1: a two-level enhancement for deriving gross receipts of more than $1,000,000 from one or more financial institutions, see § 2B1.1(b)(16)(A); a two-level enhancement for an offense involving ten or more victims, see § 2B1.1(b)(2)(A); and a twenty-level enhancement for engendering losses of more than $7,000,000, see § 2B1.1(b)(1)(K).[6] Cox argues that the district court's misapplication of these enhancements resulted in either a six or eight-level increase in his total offense level. At the core of Cox's objection to each of these enhancements, however, is a single contention: that the district court relied, in part, on uncharged or acquitted conduct that lacked adequate evidentiary support to be considered relevant conduct under the Guidelines.

Under § 2B1.1, a defendant's offense level is increased both on the basis of the conduct for which he was convicted and on the basis of the "relevant conduct" for which he is found responsible by a preponderance of the evidence. See United States v. Pennue, 770 F.3d 985, 992-93 (1st Cir. 2014). The Guidelines define "relevant conduct" as:

---

[6] The PSR adopted by the district court used the 2012 Guidelines Manual to determine Cox's offense level.

(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant[ ] . . .

. . .

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1); see also United States v. St. Hill, 768 F.3d 33, 34 (1st Cir. 2014). Relevant conduct may include both acquitted and uncharged conduct. See United States v. Watts, 519 U.S. 148, 152-53 (1997); United States v. DeSimone, 699 F.3d 113, 128 (1st Cir. 2012) ("A court 'may consider acquitted conduct in determining the applicability vel non of a sentencing enhancement . . . .'" (quoting United States v. Paneto, 661 F.3d 709, 715 (1st Cir. 2011))); see also St. Hill, 768 F.3d at 37 ("[T]o be 'relevant conduct,' uncharged conduct must be connected to the offense of conviction.").

In the context of an extended scheme, uncharged and acquitted conduct is "relevant conduct" if it is part of the same "course of conduct or common scheme or plan" as the conduct underlying the counts of conviction. United States v. Eisom, 585 F.3d 552, 557 (discussing U.S.S.G. §§ 1B1.3 and 3D1.2(d)). A district court's finding on the scope of a particular scheme "represents a practical, real-world assessment of probabilities, based on the totality of proven circumstances." Id. (quoting

- 10 -

United States v. Sklar, 920 F.2d 107, 111 (1st Cir. 1990)). The court's finding that uncharged or acquitted conduct is part of a common course of conduct, scheme, or plan, is reviewed for clear error. Sklar, 920 F.2d at 110-11.

Furthermore, we have repeatedly held that a district court may rely on a PSR's relevant conduct determinations absent specific, supported challenges to its recommendations. As we have explained:

> "Generally, a PSR bears sufficient indicia of reliability to permit the district court to rely on it at sentencing." The defendant is free to challenge any assertions in the PSR with countervailing evidence or proffers, in which case the district court is obliged to resolve any genuine and material dispute on the merits. But if the defendant's objections to the PSR are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on the facts in the PSR.

United States v. Cyr, 337 F.3d 96, 100 (1st Cir. 2003) (quoting United States v. Taylor, 277 F.3d 721, 724 (5th Cir. 2001)); see also United States v. Acevedo, 824 F.3d 179, 184 (1st Cir. 2016); United States v. Olivero, 552 F.3d 34, 40 (1st Cir. 2009).

Here, Cox contends that the district court erred by simply adopting the PSR's sentencing recommendations without specific factual findings regarding each relevant conduct transaction. Indeed, on appeal, Cox now asserts that neither the Probation Office nor the district court ever reviewed any of the

- 11 -

voluminous sentencing materials filed by the government.  The record is to the contrary.

The initial PSR, dated January 2, 2013, listed Cox's total offense level as 37 and his GSR as 262-327 months based on all relevant conduct attributable to Cox.  However, Cox made no specific objections to the factual basis for the PSR's relevant conduct determination.  Instead, Cox made the following general objection to the PSR's list of relevant conduct transactions:

> The defendant objects to this paragraph in its entirety. The report provides no factual basis for the [sic] supporting the statement, "the fraudulent property transactions in which Cox has been implicated [sic] are detailed below."  The chart lists properties which were the basis for Counts on which Mr. Cox was acquitted. Mr. Cox objects to the inclusion of acquitted Counts in the loss calculation.   It lists other properties, purported "relevant conduct," though not so identified, for which  no evidence is offered to prove Mr. Cox was even involved in the sale of the properties, much less that there was fraud involved, and that he participated in the fraud.  It appears the prosecution simply burdened Probation with an offense conduct narrative, devoid of factual specifics or substantiating documentation, vitiating Probation's ability to conduct an independent review  of  the  offense  conduct,  as  required  by F. R. Crim. P. 32.

(second alteration in original).  In addition to filing its own objections to the PSR, the government subsequently filed a binder on August 16, 2013, labeled "Supporting Documents for Loss Calculation," which contained a chart calculating the loss the government alleged was caused by Cox's scheme, as well as more

than 300 pages of registry of deeds documents supporting the chart's calculations.

The revised PSR, issued on August 21, 2013, addressed the parties' objections. In responding to Cox's objection to the factual basis for the PSR's loss calculation, it stated:

> When computing a loss calculation, it is proper to include all of the loss (charged conduct, acquitted conduct, and relevant conduct where a preponderance of the evidence supports the inclusion) as was done in this instance. It is not practical for the Probation Officer to provide the details of every transaction in which the defendant was involved for purposes of the [PSR]. Counsel for the government has provided the Probation Officer, the Court, and defense counsel, with a large binder that includes supporting documentation for the loss calculation. The increase for 10 or more victims is proper and the loss calculation is accurate. It is noted that this Court found the increase for 10 or more victims applicable in related defendant Rebecca Konsevick's case.

The PSR continued:

> The Probation Office maintains that the loss calculation is an [sic] accurately computed in this instance as is the offense level calculation. Defense counsel, if he chooses, can argue that this calculation over-represents the defendant's culpability/conduct. No change is made to the report.

On September 12, 2013, three weeks after the revised PSR was issued, the government filed its sentencing memorandum, along with a second binder, labeled "Relevant Conduct," containing more than 500 pages of documents providing evidentiary support for the relevant conduct determination. In its memorandum, the government

- 13 -

argued that, based on the evidence presented, the PSR had correctly calculated Cox's GSR.

Cox filed his own sentencing memorandum on December 17, 2013, in which he challenged various aspects of the PSR. In his memorandum Cox did not, however, raise specific objections to the PSR's relevant conduct determination. Instead, Cox repeated his general objections to the PSR's recommendation, specifically referencing the documentation filed by the government:

> In the present case, the government provided Probation and the defense with a binder of exhibits consisting of deeds of various properties, and a chart entitled "Loss of Specific Properties." In most of the deeds, Mr. Cox's name does not appear. There is no indication in the exhibit what, if any role he played in the purchase or sale of the properties. There is no indication whether fraud was involved in the purchase or sale of the properties, or the reason the properties were foreclosed upon. On the basis of the foregoing defendant contends that "loss" falls between $400,000 and $1,000,000 and a 14 level increase under U.S.S.G. § 2B1.1(b)(1)(H) is applicable.

The district court convened Cox's sentencing hearing on December 19, 2013. After hearing lengthy argument from counsel regarding the Guidelines enhancements -- including a specific inquiry into the factual support for the uncharged transactions included as relevant conduct in the PSR[7] -- the district court stated the basis for its factual decisions:

---

[7] Specifically, the court asked counsel for the government to discuss the basis for the relevant conduct listed in the PSR. The government, in a lengthy response, detailed how the relevant

Counsel, . . . I did have the benefit, as you know, of presiding over Mr. Cox's trial, and I have also had the benefit of reviewing materials, both that were offered as exhibits at the trial, were the subject of some pretrial motion practice, and as are before the Court at sentencing.

The court then rejected Cox's objections to the PSR's relevant conduct determination:

I respectfully disagree with [Cox's counsel] in terms of the basis of the numbers that are provided by the government here based on the trial record and the PSR. I think it's certainly under the Guidelines appropriate to include relevant conduct and acquitted conduct. . . .

Based on this record, we discern no error in the district court's decision to adopt the PSR's sentencing recommendations, which were fully supported by the evidence presented at trial and the voluminous supporting materials submitted by the government. Cox's various objections -- as to the PSR, as well as those made in his sentencing memorandum and at his sentencing hearing -- are too general and unsupported to require the district court at sentencing to engage in a transaction-by-transaction analysis of the PSR's relevant conduct determination. See Cyr, 337 F.3d at 100 ("[I]f the defendant's objections to the PSR are merely rhetorical and unsupported by countervailing proof, the district

_____

conduct transactions involved "the same straw buyers [and] the same false statements," as well as the same "netting of funds because buyers did not bring cash to closings," and the same false employers, as well as the fact that Cox received proceeds from the transactions.

- 15 -

court is entitled to rely on the facts in the PSR."); United States v. Prochner, 417 F.3d 54, 66 (1st Cir. 2005) (upholding reliance on a PSR's listing of victims and loss amounts "[i]n the absence of rebuttal evidence beyond defendant's self-serving words").

Indeed, there is no genuinely disputed evidence at issue in this case. Cox's objections, at bottom, are merely rhetorical assertions that the evidence before the court was insufficient to support the relevant conduct determination. Rule 32(i)(3)(A) explicitly states that a district court "may accept any undisputed portion of the PSR as a finding of fact." Olivero, 552 F.3d at 39 (citing Fed. R. Crim. P. 32(i)(3)(A)). Merely asserting, without more, that the evidence before a sentencing court was insufficient, does not raise a dispute as to the validity of a PSR's recommendations. See id. at 39-40 ("If the facts plausibly support competing inferences, . . . a sentencing court cannot clearly err in choosing one."). Here, the district court adequately explained that it was adopting the PSR's relevant conduct determination based on the evidence in the record. Thus, in the absence of genuinely controverted evidence, the court's decision to credit the facts underlying the PSR was not clearly erroneous.

Cox's present challenges to individual relevant conduct transactions -- each of which is made for the first time on appeal and is thus subject only to plain error review -- fare no better. First, Cox argues that three transactions involving one straw buyer

-- Larneshia Bryant-Alexander -- were not supported by sufficient evidence.  The record before the district court at sentencing, however, indicates that, as to two of the properties, Bryant-Alexander's stated income on the mortgage application was false. As for the third property, Bryant-Alexander's application contained false claims about her employment status, as well as a representation that she paid more than $17,000 at closing, when Cox actually made that payment.

Cox also argues that the district court erred in including five separate transactions as relevant conduct because they involved straw buyers who were not involved in any of the transactions listed in the indictment.  However, the record shows that each of these transactions involved the same types of false statements in mortgage applications that underlay the convicted and acquitted conduct.  Moreover, Cox himself received the majority of the proceeds from each of these transactions, additionally supporting the district court's determination that these transactions were relevant conduct under U.S.S.G. § 1B1.3.

Cox's last specific objection involves one property that Cox purchased himself.  However, his mortgage application for this property contained the same type of false statements as those made on behalf of straw buyers.  The fact that Cox made these statements himself, rather than through a straw buyer, does not place them

- 17 -

outside "the same course of conduct or common scheme or plan as the charged conduct." Eisom, 585 F.3d at 557.

Hence, despite Cox's protestations to the contrary, the record reveals no error in the district court's relevant conduct determinations, plain or otherwise. Having determined that these factual findings were procedurally sound, we can easily dispose of Cox's objections to each of the § 2B1.1 enhancements. As to the two-level enhancement for an offense involving ten or more victims, the loss chart adopted by the district court identified far more than ten lenders (or their successors-in-interest) who suffered financial losses as a result of Cox's fraud. Similarly, the district court's decision to impose a two-level enhancement for deriving gross receipts of more than $1,000,000 was supported by ample evidence.

With respect to the court's loss calculation, Cox does make one additional objection based on the court's methodology. Although we review the application of the court's loss-calculation methodology for clear error, determining the correct methodology is "a prototypical question of legal interpretation" that we review de novo.[8] United States v. Walker, 234 F.3d 780, 783 (1st Cir. 2000).

_____

[8] The government contends that our review should be for plain error because Cox failed to make an objection to the district court's loss methodology. See United States v. Mitrano, 658 F.3d

- 18 -

In calculating the amount of actual loss caused by Cox's scheme to defraud, the district court stated that it was applying the formula set forth in United States v. Appolon, 695 F.3d 44 (1st Cir. 2012). There, we held that

> [i]n cases where a defendant has pledged collateral to secure a fraudulent loan, actual loss usually can be calculated by "subtracting the value of the collateral -- or, if the lender has foreclosed on and sold the collateral, the amount of the sales price -- from the amount of the outstanding balance on the loan."

Id. at 67 (emphasis added) (quoting United States v. James, 592 F.3d 1109, 1114 (10th Cir. 2010). Cox points out that the loss chart adopted by the district court calculated loss by subtracting the value of the properties from the original loan amount, rather than from the outstanding loan balance. He reasons that, because Appolon instructs that "actual loss is always the difference between the original loan amount and the final foreclosure price (less any principal repayments)," the failure to ascertain the outstanding balance for every loan at issue was procedural error. Id. (emphasis added). Cox misconstrues our instructions in Appolon.

We did not hold in Appolon that a court may only determine actual loss if the government has presented evidence of the outstanding principal balance on every alleged fraudulent

_____

117, 123-24 (1st Cir. 2011). Because Cox's claim fails under either standard, we do not resolve this disagreement.

- 19 -

loan. Such a requirement would run afoul of the Guidelines's clear instruction that a district court need not establish loss with precision, but rather, may make a reasonable estimate of the loss, based on the available information. See United States v. Adorno-Molina, 774 F.3d 116, 126 (1st Cir. 2014); U.S.S.G. § 2B1.1, cmt. n.3(C). See also United States v. Alphas, 785 F.3d 775, 783 (1st Cir. 2015) (noting that the Guidelines use the amount of loss as a rough proxy for "the seriousness of the crime and the relative culpability of the offender" in determining a GSR). Indeed, we discussed this issue in Appolon, noting that, given the "relatively short lifespan of the loans" in that case, and the fact that the defendant's "scheme was based on allowing the loans to default, any difference between the original loan amounts and the outstanding balances [was] probably not significant." Appolon, 695 F.3d at 68 n.13.

Here, too, the short period of time before Cox's unqualified straw buyers defaulted on their mortgages means that any principal payments would be unlikely to impact the district court's loss calculation.[9] In fact, we reached a similar

---

[9] Although not addressed by either party, Cox's argument here requires that we assume the mortgage loans at issue were not interest-only or negatively amortizing loans, a type of mortgage loan that was not uncommon before the subprime mortgage crisis. See generally, Nat'l Comm'n on the Causes of the Fin. & Econ. Crisis in the U.S., The Financial Crisis Inquiry Report 124 fig. 7.3 (2011). Such loans, if at issue here, could result in actual losses equal to or greater than the amount of the original loans,

conclusion in United States v. Foley, 783 F.3d 7, 25 (1st Cir. 2015), where we rejected a defendant's claim that the district court failed to account for certain loan principal payments because the defendant had "offer[ed] no figure for the borrowers' principal repayments." Hence, we concluded, the defendant's argument amounted "to no more than mere speculation, which we need not credit on appeal." Id. Cox's contention is no less speculative. His only support for this claim is trial testimony from a few straw purchasers who recalled having made a small number of mortgage payments before lenders foreclosed on the properties. Thus, like the defendant in Foley, the absence of any specific figures regarding principal repayments dooms this argument.[10]

## C. Variant Sentence

Cox's final claim of procedural error is somewhat puzzling. He argues that the district court improperly imposed a sentence based on an "alternative" GSR that was "commensurate with

---

even if the straw purchasers had timely made some mortgage payments to the lenders.

[10] Furthermore, even if Cox was able to put forth some evidence of principal repayments by straw buyers, failing to deduct these amounts from the loss total would likely be harmless error. The district court found actual loss of more than $7.8 million, and the threshold for a twenty-level enhancement under § 2B1.1(b)(1)(K) was $7 million at the time Cox was sentenced. Thus, to demonstrate prejudicial error, Cox would have to show that more than $800,000 in principal was repaid to lenders. Absent such a showing, he cannot demonstrate he suffered any prejudice. See Foley, 783 F.3d at 25.

- 21 -

a GSR using only the counts of conviction to assess loss amounts and gross receipts," but which relied on uncharged and acquitted conduct to apply the two-level enhancement for crimes involving ten or more victims. According to Cox, this "alternative calculation" should have resulted in a base offense level of 31 and a GSR of 108-135 months, instead of a GSR of 135-168 months. In other words, after vigorously contending that the GSR of 262-327 months adopted by the court was procedurally unreasonable, Cox alleges that he was actually sentenced under a lower, but still procedurally inadequate, GSR.

This purported "alternative" GSR is not supported by the record. The court did note, in passing, that "even if [the court] excluded acquitted conduct . . . [it] would still be appropriate" to impose a twenty-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K) for engendering losses greater than $7 million. That single remark hardly demonstrates that the court adopted, implicitly or otherwise, a different Guidelines calculation than the one it did. Indeed, the district court explicitly stated the GSR and offense level it chose: "I will adopt the base level of offense of 37" and "I will adopt . . . an advisory guideline[s] range [of] 262 to 327 months." And, as we have explained in rejecting Cox's other procedural objections to his sentence, this advisory GSR was properly calculated. Hence, the district court committed no procedural error.

## IV. Substantive Reasonableness

Cox also contends that his sentence was substantively unreasonable because it was "significantly and unjustifiably higher" than sentences imposed on other defendants for similar crimes. We do not agree.

We have repeatedly emphasized that "[a] challenge to the substantive reasonableness of a sentence is particularly unpromising when the sentence imposed comes within the confines of a properly calculated GSR." United States v. Demers, 842 F.3d 8, 15 (1st Cir. 2016). Less promising still is a defendant's challenge to a sentencing court's substantial downward variance from a properly calculated GSR. See United States v. Floyd, 740 F.3d 22, 39-40 (1st Cir. 2014) (noting that, when a district court provides a substantial downward variance from a properly calculated GSR, "a defendant's claim of substantive unreasonableness will generally fail"); King, 741 F.3d at 310. This case is no exception to the general rule.

After properly calculating Cox's GSR of 262-327 months, the district court allowed both parties to present arguments, permitted Cox to address the court himself, thoroughly reviewed all of the § 3553(a) factors, and, in light of that review, rejected the government's recommendation of a 180-month sentence and imposed a 150-month sentence. Cox now argues that the 112-month downward variance from the low-end of the properly-

calculated GSR -- imposed, in part, to avoid unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6)[11] -- did not go far enough.

Under 18 U.S.C. § 3553(a)(6), a sentencing court must consider, inter alia, the need to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Cox identifies three fraud cases in this circuit in which defendants received sentences shorter than the one imposed here, but makes no serious effort to explain why he is similarly situated to the defendants in those cases.  As we recently explained in United States v. Nuñez, 840 F.3d 1, 7 (1st Cir. 2016), "[m]erely pointing to a coconspirator's [lower] sentence, without more, does not prove the existence of an impermissible sentencing disparity," because "'a defendant is not entitled to a lighter sentence merely because his co-defendants

---

[11] In discussing the need to avoid unwarranted sentencing disparities, the district court explained:

> I do think a substantial sentence is warranted, and I've given consideration . . . to unwarranted sentencing disparities.  I think the submission by the government appropriately reflects other serious cases involving financial fraud in this district, some that are in some degree different from yours in terms of the scope of the crime, in terms of the total loss amount, but I think it's appropriate for me to consider those in gauging what an appropriate sentence is here.

> For all of these reasons, given all of the goals of sentencing, all of the factors under 3553(a), I don't adopt the government's recommendation of 180 months, but I do adopt a significant sentence of 150 months, Mr. Cox.

received lighter sentences.'" Id. (quoting United States v. Gomez-Pabon, 911 F.2d 847, 862 (1st Cir. 1990). Merely pointing to the sentences of unrelated defendants sentenced by different judges is even less persuasive. See Foley, 783 F.3d at 26. Here, because Cox fails to develop his conclusory argument, he has failed to demonstrate that the below-guidelines sentence imposed by the district court was substantively unreasonable.

## V. Forfeiture

Finally, Cox contests the forfeiture award ordered by the district court. The court granted the government's motion for forfeiture of property in the amount of $2,966,334.37. This amount included all proceeds Cox received from the convicted transactions -- $860,210.52, according to the loss chart adopted by the district court -- as well as all proceeds Cox received from uncharged relevant conduct.[12] Cox contends that the district court

---

[12] The government's forfeiture motion excluded funds from transactions based on acquitted conduct. Although the government provides no explanation for its decision to exclude these funds from its motion, it asserts that there would have been no legal obstacle to requesting funds based on acquitted conduct in this case. For the reasons set forth below, we can find no basis for drawing a distinction between the uncharged and acquitted conduct in the context of a broader scheme to defraud. See United States v. Capoccia, 503 F.3d 103, 117–18 (2d Cir. 2007) (stating that, "[w]here the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise," the proceeds for purposes of forfeiture include the proceeds of "that scheme, conspiracy, or enterprise"); see also United States v. Hasson, 333 F.3d 1264, 1279 (11th Cir. 2003) (holding, for purposes of forfeiture, that "[i]n determining what transactions involved the proceeds of mail and wire fraud, the jury was not restricted

- 25 -

erred by including proceeds from uncharged relevant conduct in the forfeiture order because, he claims, "the criminal forfeiture statute does not authorize the forfeiture of funds based on unconvicted conduct." Although we have not directly addressed this argument before, we join the other circuits that have concluded that a court may order forfeiture of the proceeds from uncharged conduct that was part of the same fraudulent scheme alleged in the counts of conviction.

In this case, the government sought forfeiture under 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2)(A), and 28 U.S.C. § 2461.[13] The relevant language from these statutes is broadly framed to reach property beyond "the amounts alleged in the count(s) of conviction." United States v. Venturella, 585 F.3d 1013, 1017 (7th Cir. 2009); see also United States v. Lo, 839 F.3d 777, 793 (9th Cir. 2016). Specifically, 18 U.S.C. § 982(a)(2)

_____

to the three substantive counts of wire fraud on which it returned a guilty verdict" and could consider evidence of fraud offered in support of an additional money laundering count).

[13] More specifically, the government sought forfeiture of property related to Cox's violations of 18 U.S.C. § 1957 (money laundering) under 18 U.S.C. § 982(a)(1), violations of 18 U.S.C. § 1344 (bank fraud) under 18 U.S.C. § 982(a)(2)(A), and violations of 18 U.S.C. § 1343 (wire fraud) under 18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461. In his brief, however, Cox refers to "the criminal forfeiture statute," citing only 18 U.S.C. § 982. He does not mention 18 U.S.C. § 981 and 28 U.S.C. § 2461, the statutes under which the government sought forfeiture of property derived from Cox's violations of 18 U.S.C. § 1343.

subjects to forfeiture "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as a result of" certain specified offenses, including bank fraud under 18 U.S.C. § 1344.  See also id. § 982(a)(1) (requiring forfeiture of "any property . . . involved in" a violation of 18 U.S.C. § 1957 and of "any property traceable to such property."  Similarly, 18 U.S.C. § 981(a)(1)(C) authorizes forfeiture for "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the commission of certain crimes, including bank fraud under 18 U.S.C. § 1344.[14]  The term "proceeds" is defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  18 U.S.C. § 981(a)(2)(A).

Both the Seventh and Ninth Circuits relied on this inclusive statutory language to conclude that, in the case of

_____

[14]  Although 18 U.S.C. § 981 is titled "Civil forfeiture," it applies in criminal cases pursuant to 28 U.S.C. § 2461, which authorizes criminal forfeiture of the proceeds of any offense for which there is no specific statutory basis for criminal forfeiture as long as civil forfeiture is permitted for that offense.  See Venturella, 585 F.3d at 1016 (discussing § 2461).  The criminal forfeiture statute, 18 U.S.C. § 982, covers only certain forms of wire fraud, such as those that affect a financial institution.  Id. at § 982(a).  Hence, forfeiture in cases of wire fraud not involving financial institutions falls under 28 U.S.C. 2461 and 18 U.S.C. § 981.

- 27 -

crimes that involve a scheme to defraud, funds "obtained . . . as a result" of the offense "consist of the funds involved in that fraudulent scheme, including additional executions of the scheme that were not specifically charged or on which the defendant was acquitted." Lo, 839 F.3d at 793; see Venturella, 585 F.3d at 1017 (noting that, because defendants "pled guilty to one count of mail fraud that also alleged a fraudulent scheme," the amount of the single mailing "does not adequately account for the proceeds obtained from their crime of conviction"); see also United States v. Fruchter, 411 F.3d 377, 384 (2d Cir. 2005) (holding, under RICO forfeiture provisions, that "proceeds derived from conduct forming the basis of a charge of which the defendant was acquitted can be counted as 'proceeds' of racketeering activity"). We agree with this reading of the forfeiture statutes and find that it applies here.

As we already have held, the district court properly concluded by a preponderance of the evidence that all of the uncharged and acquitted conduct was part of the same scheme to defraud. Although Cox asserts that, for purposes of forfeiture, the court was required to find beyond a reasonable doubt that the uncharged conduct was part of the same scheme, we disagree. We have previously observed that a forfeiture award "is a part of the sentence rather than the substantive offense." United States v. Ferrario-Pozzi, 368 F.3d 5, 8 (1st Cir. 2004); see also Libretti

v. <u>United States</u>, 516 U.S. 29, 38-39 (1995).  As such, the preponderance of the evidence standard applies.  <u>See</u> <u>Munyenyezi</u>, 781 F.3d at 544; <u>see</u> <u>also</u> <u>Hasson</u>, 333 F.3d at 1277 ("[C]riminal forfeiture is part of sentencing where the preponderance standard governs.").

Hence, the district court did not err in including the proceeds of the uncharged relevant conduct in its forfeiture award.

<u>Affirmed</u>.